UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Hart Ski Corporation, a Minnesota
corporation and QAM Corporation, a
Minnesota corporation,

File No. 09 ev 1276 DWF/JJK

Plaintiffs,

**COMPLAINT**

v.

Glen Johnson, an individual, Johnson-
Muckerman Enterprises, Inc., a Colorado
corporation, John Doe, Jane Doe, XYZ
Corporation and ABC Partnership,

Defendants.

---

Plaintiffs Hart Ski Corporation and QAM Corporation ("Plaintiffs"), for their

Complaint against Defendants Glen Johnson and Johnson-Muckerman Enterprises, Inc.,

state and allege as follows:

## THE PARTIES

1.    Plaintiff Hart Ski Corporation ("Hart Ski Corporation") is a Minnesota

corporation with its principal place of business in Wayzata, Minnesota.

2.    Plaintiff QAM Corporation ("QAM") is a Minnesota corporation with its

principal place of business in Wayzata, Minnesota.

3.    Defendant Glen Johnson ("Defendant Johnson") is an individual who

resides at 252 Piney Acres Cir., Dillon, Colorado 80435.

SCANNED
JUN 02 2009
U.S. DISTRICT COURT MPLS

4.     Defendant Johnson-Muckerman Enterprises, Inc. ("Johnson-Muckerman Enterprises") is a Colorado corporation with its principal place of business in Dillon, Colorado.

## JURISDICTION AND VENUE

5.     The Court has subject matter jurisdiction based upon diversity of citizenship pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

## BACKGROUND FACTS

### Background of Hart Skis

6.     Hart Skis was founded in 1955 by Hartvig "Hart" Holmberg, his brother Harry Holmberg, and Ed Bjork, based upon the introduction of their pioneering seamless metal edged snow ski.

7.     By the mid-1960's, Hart Skis dominated the ski market with forty percent (40%) of the U.S. market and revenues in excess of Ten Million Dollars ($10.0 M) per year.

8.     During this time, Hart Skis introduced the revolutionary Javelin freestyle ski, which was eagerly adopted by participants in the burgeoning freestyle skiing phenomenon, an area in which Hart Skis was an undisputed market leader.

9.     In 1969, Hart Skis was sold to Beatrice Foods, which subsequently allowed the brand to languish in the 1980s.

10.     Hart Skis continued to lose market share through the 1990s.

11.    In or around 1997, a United Sports Group acquired Hart Skis from Beatrice Foods, which also failed.

12.    In 2003, Bill Holmberg, grandson of Hart Skis founder Hartvig Holmberg, began Hart Ski Manufacturing, LLC ("Hart Ski Manufacturing") and acquired Hart Skis, and set out to attract investors with a strategy to reintroduce the world to the Hart Ski brand and to build well-built, durable skis for skiers of all abilities, with plans to regain leadership in freestyle and downhill ski design technologies.

13.    Despite attracting investors, Bill Holmberg struggled with the operation of Hart Ski Manufacturing.

14.    While Bill Holmberg owned Hart Ski Manufacturing, Jeff Farni guaranteed a loan of $100,000.00 for Hart Ski Manufacturing, pursuant to Bill Holmberg's request, which allowed Hart Ski Manufacturing to remain in business.

15.    Even with this cash infusion, Bill Holmberg was unable to keep Hart Ski Manufacturing afloat; in or around October 2007, Bill Holmberg and the Governors of Hart Ski Manufacturing voted to sell the assets of Hart Ski Manufacturing to Jeff Farni's soon-to-be formed company, Hart Ski Corporation, in lieu of an immanent default on the note.

16.    In or around October 2007, QAM and Hart Ski Corporation were formed with Hart Ski Corporation as a wholly owned subsidiary of QAM.

17.    QAM acquired the Hart ski brand and its operations through an asset purchase from Hart Ski Manufacturing.

18.     At all times referenced herein, Jeff Farni and Chris Farni have been members of the board of directors for Hart Ski Corporation.

19.     At all times referenced herein, Chris Farni has been the CEO of Hart Ski Corporation.

20.     At all times referenced herein, Julie Farni was the Corporate Administrative Officer ("CAO") of Hart Ski Corporation.

21.     In October 2008, Julie Farnie was appointed the Corporate Financial Officer ("CFO") for Hart Ski Corporation as well.

22.     In a good-faith effort to ameliorate the losses of the investors of Hart Ski Manufacturing, Hart Ski Corporation made the investors of Hart Ski Manufacturing minor shareholders of Hart Ski Corporation in exchange for their participation on an advisory committee.

23.     To further ameliorate the losses of the investors of Hart Ski Manufacturing, Hart Ski Corporation also took on some of Hart Ski Manufacturing's debt.

24.     Bill Holmberg, as a legacy owner and grandson of the Hart Skis founder, was granted an equity interest in the newly formed Hart Ski Corporation with an option to purchase additional shares.

25.     Upon acquiring the Hart ski brand, Hart Ski Corporation sought to re-establish the Hart name as a pioneer and leader in freestyle and downhill ski technology, design and fabrication in Europe, Canada and the United States.

26.     In the short time since Hart Ski Corporation acquired the Hart ski brand, Hart Ski Corporation has signed sponsorship deals with numerous individual pro skiers

4

and has again emerged as a market leader in freestyle and downhill ski design and production.

27.    The 2008 Men's National Single and Dual Mogul Champion, 2009 FIS World Cup Men's Gold Medal Champion, and 2009 US Men's and Women's National Mogul champions and the 2009 World Cup Rookie of the Year have been recruited and signed by Hart Ski Corporation.

28.    In a return to its former prominence, in March 2008, Hart Ski Corporation secured a sponsorship as the official supplier for the U.S. Freestyle Ski Team and supplies competitive skis to eight (8) members of the U.S. Freestyle Mogul Team, many of whom will be on the 2010 U.S. Olympic Freestyle Team.

### Defendant Johnson is Introduced to Hart Ski Corporation

29.    In or about Spring 2008, Hart Ski Corporation began searching for investors to finance early inventory purchases for the newly formed company.

30.    In or around April 2008, a Farni family acquaintance, introduced Chris Farni to Defendant Johnson, who at that time was a resident of Dillon, Colorado.

31.    At the time of the introduction, Defendant Johnson represented himself as possessing considerable independent wealth acquired through his ownership of a Colorado construction company, and as a valuable resource for connections to the skiing community in Colorado and the Rocky Mountains.

32.    During the discussions between Plaintiff and Defendant Johnson, Chris Farni informed Defendant Johnson that Hart Ski Corporation would need up to Three Hundred Thousand and 00/100 Dollars ($300,000.00), to purchase ski inventory.

33.     In response, Defendant Johnson informed Chris Farni that he was willing to be the "banker" for Hart Ski Corporation's purchase of ski inventory up to $300,000.00; according to Defendant Johnson, he was able to serve as Hart Ski Corporation's "banker" given his significant financial resources as a multimillionaire having made $200,000.00 - $300,000.00 per year in the construction industry.

34.     After the Farni's introduction to Defendant Johnson and Defendant Johnson's representations about his independent financial wealth and willingness to be Hart Ski Corporation's "banker" for the purchase of ski inventory up to $300,000.00, Defendant Johnson and Chris Farni traveled to Chiavenna, Italy to visit the factory producing Hart Ski Corporation's hand-crafted skis.

35.     In addition, Defendant Johnson and Chris Farni traveled to Austria and the Czech Republic to investigate other factories that could produce skis.

36.     Accompanying Defendant Johnson and Chris Farni was Horst Reinel, an individual with a long history of involvement with Hart Skis and who owned "Hart Deutschland," currently representing Hart Ski Corporation's ski line in the European Union ("E.U."), among other parts of the world.

37.     Prior to Defendant Johnson's involvement, Mr. Reinel had demonstrated discontent for the Farni's operation of Hart Ski Corporation and acquisition of the Hart Ski brand.

38.     For example, Mr. Reinel did not appreciate Chris Farni's desire to focus the Hart ski brand on freestyle and mogul skiing, and routinely described such skiing as "mickey-mouse skiing."

39.     After the aforementioned meeting, Mr. Reinel and Defendant Johnson established an instant rapport; given Chris Farni difficulties with Mr. Reinel, it was agreed that Defendant Johnson would thereafter work with Mr. Reinel in establishing a Hart Ski Corporation presence in the EU.

40.     By mid-May 2008, Defendant Johnson and Hart Ski Corporation entered into additional discussions regarding a future and ongoing relationship between Defendant Johnson and Hart Ski Corporation.

41.     As part of those discussions, Defendant Johnson represented to Hart Ski Corporation that he had One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) in cash at his immediate disposal to lend to Hart Ski Corporation to purchase ski inventory as Hart Ski Corporation's "banker."

42.     Defendant Johnson further represented to Hart Ski Corporation that he had an additional $150,000.00 that he could lend to Hart Ski Corporation at a later date as Hart Ski Corporation's "banker," for the purchase of additional ski inventory, for a total loan amount of $300,000.00 as previously represented.

43.     In reliance thereon, Hart Ski Corporation ordered inventory based on Defendant Johnson's promise to loan funds to Hart Ski Corporation up to $300,000.00 for the purchase of ski inventory as Hart Ski Corporation's "banker."

44.     Defendant further represented that he had significant contacts within the Colorado skiing community and was excited about the prospect of helping Hart Ski Corporation market its skis in Colorado, as well as managing the sales world-wide as Director of Sales and COO.

45.     Based on Defendant's representations, Defendant and Hart Ski Corporation entered into the business relationships described below.

46.     At this time, Chris Farni, as CEO of Hart Ski Corporation, was very excited about the opportunity to have Defendant Johnson on board to assist with the duties and responsibilities of Chief Operating Officer ("COO") and Director of Sales.

## Defendant Johnson enters into an Employment Agreement with Hart Ski Corporation

47.     On May 30, 2008, Defendant Johnson entered into an Employment Agreement with Hart Ski Corporation, making Defendant Johnson the Chief Operating Officer and Director of Sales of Hart Ski Corporation.  A true and correct copy of the Employment Agreement is attached hereto as **Exhibit A**.

48.     As compensation for Defendant Johnson's employment, Hart Ski Corporation allowed Defendant Johnson to design his own compensation plan, pursuant to which Hart Ski Corporation agreed to pay Defendant Johnson an annual salary of Twenty Thousand and 00/100 Dollars ($20,000.00), plus a bonus based on the number of skis sold, annually, based on the following arrangement:

>   A. $25,000 if 1,000 skis are sold;
>   B. $70,000 if 1,500 skis are sold;
>   C. $80,000 if 2,000 skis are sold; and
>   D. $90,000 if 2,500 skis are sold.

49.     Pursuant to the Employment Agreement, these bonus amounts were to be adjusted to the extent that the average gross margin realized was less than $150.00 per pair sold; if the gross margin achieved was less than $150.00 average then the actual

8

average gross margin divided by the $150.00 gross margin percentage would be applied to the respective bonus amount

50.     As additional compensation for Defendant Johnson's employment, Defendant Johnson received a five percent (5%) ownership interest in QAM – the parent company of Hart Ski Corporation – upon the execution of the Employment Agreement.

51.     Under the Employment Agreement, Defendant Johnson was also entitled to receive an additional 5% ownership interest in QAM if 2,500 pairs of skis were sold within the first year.

52.     Under the Employment Agreement, Defendant Johnson agreed that if he left the employ of Hart Ski Corporation within the first six (6) months of his employment, he would return his initial 5% of QAM Corporation stock.

53.     Under the Employment Agreement, and in return for the compensation described above, Defendant Johnson agreed to the following:

> A. To devote such business, time and services to the affairs of Hart Ski Corporation as may be reasonably required by the Chief Executive Officer and the Board of Directors of Hart Ski Corporation to carry out his duties;
>
> B. Not engage in any other ski related business or as a consultant to any other business entity in the ski industry or to other individuals associated with the ski industry during the term of this Agreement, without the written consent of the Company's CEO; and
>
> C. Perform such duties as Chief Operating Officer and Director of Sales as may be reasonably assigned to him from time to time by the Chief Executive Officer and Board of Directors of Hart Ski Corporation.

54.     Under the Employment Agreement and in return for the above-referenced compensation, Defendant Johnson agreed that during the period of his employment by Hart Ski Corporation and for a further period of one (1) year after termination, he would not directly or indirectly as an owner, stockholder, partner, employee, or otherwise engage in a similar business as Hart Ski Corporation.

**Defendant Johnson enters into a Debenture Agreement with Hart Ski Corporation**

55.     In reliance upon Defendant Johnson's representations about his independent wealth and willingness to loan up to a total amount of $300,000.00 to Hart Ski Corporation as its "banker," on or about June 2, 2008, Hart Ski Corporation entered into a Debenture Agreement with Defendant Johnson, a true and correct copy of which is attached hereto as **Exhibit B**.

56.     Pursuant to the Debenture Agreement, Defendant Johnson loaned $150,000.00 to Hart Ski Corporation at an annual interest rate of ten percent (10%), the full amount due and owing on June 2, 2009.

57.     As a condition of the Debenture Agreement, Hart Ski Corporation granted Defendant Johnson, as an employee of Hart Ski Corporation, a first position security and collateralization as to Hart Ski Corporation's inventory in transit, product inventory wherever located, and accounts receivable.

58.     However, in October 2008, Hart Ski Corporation discovered that rather than loan $150,000.00 in cash as Defendant Johnson represented he would do as Hart Ski Corporation's "banker," Defendant Johnson had borrowed against his wife's Bank of

America investments in order to obtain the cash; this was not disclosed to Hart Ski Corporation at the time it entered into the Debenture Agreement.

59.     Furthermore, Hart Ski Corporation later discovered that Defendant Johnson may not have intended to loan an additional $150,000.00 into Hart Ski Corporation, as he previously represented he would do as Hart Ski Corporation's "banker," or may not have had the funds available for such an additional loan.

60.     Had Hart Ski Corporation known that Defendant Johnson had to borrow the money for his $150,000.00 loan to Hart Ski Corporation, or that Defendant Johnson may not have been willing to loan up to $300,000.00 to Hart Ski Corporation for the purchase of inventory, Hart Ski Corporation would not have entered into the business relationship with Defendant Johnson including the Debenture Agreement referenced above and the Employment Agreement referenced below.

61.     On June 2, 2009, Hart Ski Corporation fully repaid Defendant Johnson under the Debenture Agreement; upon information and belief, Hart Ski Corporation overpaid Defendant Johnson under the Debenture Agreement, but is unable to determine the amount overpaid due to Defendant Johnson's refusal to provide an accounting of monies received as more fully described below.

**Defendant Johnson begins his employment with Hart Ski Corporation**

62.     In or about July 2008, Defendant Johnson began his employment with Hart Ski Corporation as COO and Director of Sales.

11

63. Among his early ideas, Defendant Johnson suggested that Hart Ski Corporation develop, produce and market junior race skis to ski teams in the United States.

64. Defendant Johnson made this suggestion based on his represented knowledge that there was an existing and underserved market for high-end junior downhill race skis in the United States.

65. Based on Defendant Johnson's representations, Hart Ski Corporation developed and produced 211 junior race skis worth more than Sixty-Thousand Dollars and 00/100 ($60,000.00), to sell during the Fall/Winter 2008 season, in addition to the 1383 skis otherwise ordered and produced.

66. Hart Ski Corporation had already arranged for a distribution center to accept shipment in Shakopee, Minnesota; however, Defendant Johnson insisted to Hart Ski Corporation that the skis needed to be shipped to Colorado because that's where the skiers are located, rather than in Minnesota, where Hart Ski Corporation is headquartered.

67. In or around the end of August 2008, based on Defendant Johnson's insistence, Hart Ski Corporation had shipments of skis sent to Denver, Colorado, pursuant to Defendant Johnson's representations, where Chris Farni picked up the skis and personally drove them to Defendant Johnson's residence in Dillon, Colorado.

68. In reliance upon Defendant Johnson's representations that he would loan up to $300,000.00 to Hart Ski Corporation for the purchase of skis as Hart Ski Corporation's "banker," Hart Ski Corporation ordered and delivered further shipments of inventory to Dillon, Colorado, in August and September 2008.

69.     In or around late September 2008, after the aforementioned skis had been ordered, Defendant Johnson informed Hart Ski Corporation that contrary to his prior representations, he would not loan any more money to Hart Ski Corporation for the purchase of skis; this was the first time Hart Ski Corporation was informed of Defendant Johnson's unwillingness to loan up to $300,000.00 to Hart Ski Corporation.

70.     As a result, Hart Ski Corporation was forced to borrow an additional $150,000.00 from Jeff Farni, QAM's majority shareholder and primary source of funding for Hart Ski Corporation, for the purchase of additional inventory that been ordered and come due based upon Defendant Johnson's representations that he would loan up to $300,000.00 to Hart Ski Corporation.

71.     Defendant Johnson's refusal to loan an additional $150,000.00 to Hart Ski Corporation, for a total loan amount up to $300,000.00, has seriously hampered Hart Ski Corporation's cash flow and subsequent operations.

72.     Subsequent to Defendant Johnson's refusal to fund the second inventory purchase and Hart Ski Corporation's need to tap into its primary source of funding (Jeff Farni), all additional inventories were shipped to Minneapolis, Minnesota.

## Defendant Johnson Demands a Modification to the Employment Agreement, which Hart Ski Corporation Refuses

73.     On or about July 24, 2008, during one of Chris Farni's trips to Colorado, Defendant Johnson produced a modification to the Employment Agreement (the "July 24 Modification") that he demanded Chris Farni sign.

74.   The July 24 Modification purported to provide that, in addition to cash bonuses for ski sales reaching specified levels, Defendant Johnson would be allowed to purchase specified amounts of Hart Ski Corporation stock at $0.10 per share, with a maximum amount of 6% of Hart Ski Corporation stock available for purchase, annually.

75.   In addition, the July 24 Modification provided that, in addition to the 5% equity position in QAM Corporation provided to Defendant Johnson as partial compensation for his employment with Hart Ski Corporation, Defendant Johnson would be entitled to purchase an additional 5% equity in QAM annually at $0.10 per share for the next two years if financing equal or greater to $150,000.00 per year is provided to Hart Ski Corporation by Defendant Johnson.

76.   Chris Farni recalls executing an addendum to the Employment Agreement in or around July 2008, but disputes executing the July 24 Modification.

77.   In July 2009, Chris Farni and Defendant Johnson discussed an addendum to the Employment Agreement, which changed the terms of the bonus structure from inventory "sold" to inventory "produced," but which otherwise left all other terms of the Employment Agreement unaltered.

78.   Chris Farni and Defendant Johnson entered into that agreement on July 24, 2008.

79.   Chris Farni never saw the July 24 Modification and does not have a copy of the addendum he did sign as the original addendum and all copies remained in Defendant Johnson's possession in and after July 2008.

80.   Chris Farni does not recall whether he signed the July 24 Modification.

14

81.     Defendant Johnson has also produced a subsequent modification to the July 24, 2008 Modification, allegedly executed on July 25, 2008 (the "July 25 Modification"), which purported to limit the ability of Hart Ski Corporation to terminate Defendant Johnson's employment only if Defendant Johnson performs an illegal act or if Hart Ski Corporation sales are less than 2,000 skis after two (2) years of Defendant Johnson's employment.

82.     In addition, the July 25 Modification purports to provide Defendant Johnson with first right to purchase Hart Ski Corporation stock if more shares are issued or if QAM Corporation wants to sell any of its shares of Hart Ski Corporation.

83.     Chris Farni never saw, did not discuss with Defendant Johnson and did not sign the July 25 Modification.

84.     Chris Farni does not recall whether he signed the July 25 Modification.

**Defendant Johnson and Chris Farni Participate in the Summer 2008 Club Sales**

85.     Every year the youth ski teams and ski clubs in Colorado host sales in which members of the ski teams and ski clubs can purchase new inventory from various ski industry vendors.

86.     In preparation for the annual ski team and ski club sales in Summer/Fall 2008 in Colorado, Defendant Johnson obtained a merchant account and a credit card reader for the sale of Hart Ski Corporation inventory; at all times, this merchant account was to be temporary.

87. Upon information and belief, the merchant account obtained by Defendant Johnson directed fund to be deposited in an account in Defendants' name, without access by Hart Ski Corporation or any of its other officers, directors or shareholders.

88. Johnson represented that he would provide Hart Ski Corporation with the use of the credit card reader, and would allow Hart Ski Corporation the use of the merchant account authorized to take payment via credit card.

89. As an Officer of Hart Ski Corporation, Defendant Johnson had a responsibility to provide access to Defendant Johnson's merchant account and to provide Hart Ski Corporation with a complete accounting of any and all monies into and out of Defendant's merchant account.

90. Given that responsibility, Hart Ski Corporation agreed to allow Defendant Johnson to use Defendant Johnson's merchant account and card reader as would facilitate credit card transactions at the club and team sales.

91. In or around late August and early September 2008, Chris Farni and Defendant Johnson attended ski club and ski team sales in Telluride, Colorado; Vail, Colorado; Winter Park, Colorado; Steamboat, Colorado; and Summit County, Colorado.

92. At each of these sales, Defendant Johnson used the credit card machine to swipe cards and take payment for customers' orders.

93. In addition, Chris Farni and Defendant Johnson had customers fill out order forms, which required personal information including the customers' name, address, merchandise ordered, team name, coach name, email address and credit card number.

94.     Payment for each sale made by credit card was deposited in Defendant Johnson's merchant account.

95.     In or around mid-September 2008, Hart Ski Corporation concluded its club sales for the season and Chris Farni returned to Minnesota in October 2008.

96.     Upon information and belief, Defendant Johnson returned to Dillon, Colorado, following the 2008 ski club and ski team sales.

97.     Following the 2008 ski club and ski team sales, all unsold inventory from the shipments to Dillon, Colorado, remained at Defendant Johnson's personal residence.

98.     Hart Ski Corporation left the order forms with Defendant Johnson so that he could reconcile the payments made into the merchant account with the information provided by the customers on the order forms, and submit the results of his reconciliation to Hart Ski Corporation.

99.     As of mid-October 2008, Defendant Johnson had yet to provide any accounting of the customer payments deposited into the merchant account.

**Defendant Johnson's continued sales through the merchant account.**

100.     Upon information and belief, following the 2008 ski club and ski team sales, Defendant Johnson continued to market and sell the inventory belonging to Hart Ski Corporation and located on his personal residence.

101.     Upon information and belief, Defendant Johnson employed Johnson-Muckerman Enterprises to facilitate the further sale of inventory belonging to Hart Ski Corporation, but located at Defendant Johnson's personal residence.

102. At no time did Hart Ski Corporation authorize Defendant Johnson to utilize Johnson-Muckerman Enterprises to facilitate in the sale of Hart Ski Corporation's inventory; likewise, Defendant Johnson never informed Hart Ski Corporation of his utilization of Johnson-Muckerman Enterprises.

103. In or about mid-September 2008, Defendant Johnson contracted to develop a website for Johnson-Muckerman Enterprises, operating under the assumed name GGJ Distributing, to sell Hart-brand skis.

104. Neither Defendant Johnson, nor Johnson-Muckerman Enterprises ever notified Hart Ski Corporation that he was developing website to sell skis or otherwise received Plaintiffs' authorization to develop a website to sell skis.

105. Hart Ski Corporation learned of Defendant Johnson's activities through a source other than Defendant Johnson.

106. After an inquiry by Hart Ski Corporation, Defendant Johnson notified Hart Ski Corporation that he intended to develop a website under GGJ Distributing, an assumed name of Johnson-Muckerman Enterprises, to market ski equipment for a variety of ski manufacturers, including Hart Ski Corporation and Hart Ski Corporation's competitors.

107. Upon learning of Defendant Johnson's plans, Hart Ski Corporation instructed Defendant Johnson to discontinue any discount or retail operations, and to refrain from any further sales activities outside of the scope of his employment with Hart Ski Corporation.

108.   Hart Ski Corporation instructed Defendant Johnson to discontinue those operations because they would interfere with Hart Ski Corporation's dealership network and cause potential problems for Hart Ski Corporation's relationship with its nationwide dealers.

109.   Hart Ski Corporation also instructed Defendant Johnson to discontinue those operations because they would directly compete with Hart Ski Corporation through the sale of competing brands.

110.   Despite this instruction and unknown to Hart Ski Corporation, Defendant Johnson continued to sell skis belonging to Hart Ski Corporation, through this and other distribution channels, and did not account for their sale to Hart Ski Corporation.

111.   In mid-December 2008, Hart Ski Corporation learned that Defendant Johnson had continued to sell skis through his merchant account from October 2008, and was continuing to sell and accept payment from customers for the sale of Hart skis stored at his place of residence.

112.   On multiple occasions in late November and early December, Hart Ski Corporation instructed Defendant Johnson to stop taking credit card payments on behalf of Hart Ski Corporation and provide an immediate accounting of all sales made and payments received.

113.   Again, on or about December 18, 2008, Hart Ski Corporation instructed Defendant Johnson to stop taking credit card payments on behalf of Hart Ski Corporation and provide an immediate accounting of all sales made and payments received.

114.   On or about December 22, 2008, Defendant Johnson's wife, Laura Johnson, acknowledged that Defendant Johnson continued to take and process credit card owners despite knowing that Hart Ski Corporation had instructed him to stop taking those payments.

115.   Later that day, Defendant Johnson's wife also informed Hart Ski Corporation that "Glen has sold the following ... Chris and Glen have agreed to use those sales to reduce the note payable ($1,216)"; other than this vague representation, Defendant Johnson did not provide any further accounting of his sales made and payments received for sales made to that point.

116.   Aside from sporadic e-mails containing inadequate and, upon information and belief, willfully inadequate accounting information, Defendant Johnson did not provide any formal accounting to Hart Ski Corporation for these sales.

117.   When asked to provide a more complete accounting, Defendant Johnson failed to provide any inventory accounting beyond a spreadsheet which Hart Ski Corporation could not decipher, and which Defendant Johnson failed to clarify after Hart Ski Corporation notified Defendant Johnson of this problem.

118.   Upon information and belief, Defendant Johnson informed members of the Hart Nation, PSIA Instructors, that they could place orders and collect placement for skis through Defendant Johnson, for Hart Ski Corporation.

119.   The Hart Nation, PSIA Instructors, are individuals affiliated with Hart Ski Corporation and who generated interest in the revived Hart Ski brand through demonstration of skis he received from Hart Ski Corporation.

120.   Based upon that generated interest, members of the Hart Nation, PSIA Instructors received orders for Hart Skis throughout the Fall and Winter of 2008-2009, and placed those orders through Defendant Johnson.

121.   In or around March 2009, Hart Ski Corporation learned that Defendant Johnson took payment for at least $450.00 worth of skis from at least one member of the Hart Nation, PSIA Instructors, without providing any information to Hart Ski Corporation regarding their sale or otherwise submitting the payments to Hart Ski Corporation.

122.   In addition, Defendant Johnson reported the wholesale and not pro-form prices to Hart Ski Corporation, although the members of the Hart Nation, PSIA Instructors had quoted pro-form prices to Hart Ski Corporation when asked about his sales.

123.   Defendant Johnson failed to account for some of his sales through the Hart Nation, PSIA Instructors, upon information and belief pocketing the difference between wholesale and pro-form pricing for himself for many of them.

124.   Upon information and belief, Defendant Johnson sold skis to other individuals, representatives or dealers and secretly instructed them to pay Defendant Johnson directly.

125.   Upon information and belief, Defendant Johnson knowingly withheld information of those sales from Hart Ski Corporation.

**Defendant Johnson refuses to provide Hart Ski Corporation with access to, or information regarding, Defendant Johnson's Merchant Account**

126. As stated above, when Hart Ski Corporation became aware of Defendant Johnson's merchant account, Defendant Johnson agreed that he would account for all payments into and out of the merchant account and forward all monies collected to Hart Ski Corporation.

127. To date, Defendant Johnson has failed and continues to fail to provide a full and complete accounting of his sales activity, and refused to forward the money collected to Hart Ski Corporation.

128. On many occasions, Hart Ski Corporation requested that Defendant Johnson provide Hart Ski Corporation with access to, and information regarding, the merchant account.

129. Defendant Johnson failed to provide Hart Ski Corporation with access to the merchant account.

130. Defendant Johnson failed to provide Hart Ski Corporation with a full and complete reconciliation of payment made to the merchant account other than the order forms collected by Chris Farni at the club and team sales in August and September 2008.

131. Defendant Johnson also failed to provide Hart Ski Corporation with any information regarding the merchant account.

132. Defendant Johnson never provided information to Hart Ski Corporation regarding the holder of the merchant account, the bank at which the merchant account was located, or any other identifying information regarding the merchant account.

133.   Upon information and belief, however, Defendant Johnson obtained the merchant account in the name of Johnson-Muckerman Enterprises.

**Defendant Johnson Develops a relationship with MogulSkiing.Net Website**

134.   In or about the Summer of 2008, Hart Ski Corporation contemplated adding a blog to its website advocating mogul skiing and Hart Ski Corporation's skis.

135.   Around this time, Hart Ski Corporation approached MogulSkiing.net about partnering with his website for a blog that advocated mogul skiing.

136.   Hart Ski Corporation ultimately abandoned the enterprise.

137.   However, in or about October 2008, Defendant Johnson secretly developed a relationship with MogulSkiing.Net and its management after he was aware of Hart Ski Corporation's decision not to pursue the enterprise.

138.   Defendant Johnson was also aware of Hart Ski Corporation's position on its Officers' involvement with website sales from Defendant Johnson's discussions with Hart Ski Corporation regarding GGJ Distributing.

139.   Mogulskiing.net's management agreed personally with Defendant Johnson to set up MogulSkiing.Net to receive orders of Hart Skis, and forward those orders to Defendant Johnson, personally, to process without any knowledge of Hart Ski Corporation.

140.   Hart Ski Corporation later learned of this relationship between Defendant Johnson and Mogulskiing.net through an e-mail communication between the same.

141. Since establishing the agreement, Mogulskiing.net's management informed Hart Ski Corporation that it sold skis through Defendant Johnson and MogulSkiing.net, and had a total of at least thirteen (13) orders.

142. Defendant Johnson only accounted to Hart Ski Corporation for three (3) of those sales and failed to inform Hart Ski Corporation that those sales were made through MogulSkiing.Net.

143. In addition, Defendant Johnson only accounted for the wholesale price of the skis sold, but those skis had sold at full retail price according to MogulSkiing.net's website.

144. For all sales associated with MogulSkiing.Net, Defendant Johnson failed to account for the number of sales, method of sale and amount of sale, upon information and belief pocketing the difference between wholesale and retail pricing for his personal benefit.

145. At no time did Hart Ski Corporation authorize Defendant Johnson to sell Hart Ski Corporation's skis through MogulSkiing.net or any other online avenue, let alone without providing an accounting of his sales activity to Hart Ski Corporation.

**Defendant Johnson develops a business relationship with Horst Reinel outside of Hart Ski Corporation's knowledge**

146. Beginning as early as October 2008, Defendant Johnson and Mr. Reinel engaged in a business arrangement by which Defendant Johnson would supply skis to Mr. Reinel in Germany for sale in the E.U., among other parts of the world.

147. Hart Ski Corporation was never made aware of this relationship or arrangement between Defendant Johnson and Mr. Reinel.

148. In October 2008, Mr. Reinel complained to Defendant Johnson that "I don't wanna work with hart USA anymore"; Defendant Johnson responded that he and Mr. Reinel "will be partners in the UK next year so don't worry about it. Chris [Farni] owes me a lot of money so when you sell those demo skis, send me the money and I will tell Chris I will apply it to the bill."

149. Defendant Johnson further told Mr. Reinel "[n]ever talk to Chris [Farni] again or Julie [Farni] just talk to me and I will deal with them. If Chris [Farni] sends you an email do not respond, forward the email to me so I can discuss it with him."

150. In December 2008, Defendant Johnson secretly sent fourteen (14) pairs of sample skis to Mr. Reinel and secretly requested that payment for those skis be sent directly to Defendant Johnson's home address in Dillon, Colorado.

151. At no time did Hart Ski Corporation know of or authorize this conduct between Defendant Johnson and Mr. Reinel.

**Defendant Johnson engages in a vendetta to destroy Hart Ski Corporation and acquire the Hart Ski brand for himself**

152. Beginning in or about mid-September 2008, Defendant Johnson began a vendetta against Hart Ski Corporation with the intent to destroy the Company and acquire the Hart ski brand for himself.

153. Upon information, in or about September 2008, Defendant Johnson discussed his position with Hart Ski Corporation, his equity interest, and the Debenture Agreement with an attorney acquaintance in Colorado.

154. Upon information and belief, Defendant Johnson was informed that he was "a fool" if he did not obtain a personal guaranty on the Debenture Agreement, which he did not request prior to or at the time the Debenture Agreement was executed.

155. In or about September 2008, Defendant Johnson informed Chris Farni that Defendant Johnson required a personal guaranty on the previously executed Debenture Agreement because he had "just talked to an attorney."

156. Chris Farni informed Defendant Johnson that he was not going to get a personal guaranty and that instead he was given an equity interest in QAM, options and a COO position with Hart Ski Corporation pursuant to the parties' agreements.

157. Chris Farni further informed Defendant Johnson that if Defendant Johnson would have demanded a personal guaranty, he would not have been given the equity interest in QAM or made an officer with Hart Ski Corporation – Hart Ski Corporation would not have done a deal with Defendant Johnson.

158.     Despite Chris Farni's explanation, Defendant Johnson continued to demand a personal guaranty.

159.     Thereafter, on numerous occasions Defendant Johnson informed Hart Ski Corporation's representatives, dealers and athletes that the Hart Ski Corporation Officers' alleged gross mismanagement, Hart Ski Corporation was going to default on the Debenture with Defendant Johnson.

160.     Defendant Johnson further represented to Hart Ski Corporation's representatives, dealers and athletes that he would be taking over Hart Ski Corporation in June 2009, when his Debenture Agreement matured.

161.     Thereafter, on numerous occasions Defendant Johnson informed Hart Ski Corporation's suppliers and factories that because of the Hart Ski Corporation Officers' alleged gross mismanagement, Hart Ski Corporation was going to default on the Debenture with Defendant Johnson.

162.     Defendant Johnson further represented to Hart Ski Corporation's suppliers and upon information and belief factories that he would be taking over Hart Ski Corporation in June 2009, when his Debenture Agreement matured.

163.     Thereafter, on numerous occasions Defendant Johnson informed Hart Ski Corporation's investors that the Hart Ski Corporation Officers' alleged gross mismanagement, Hart Ski Corporation was going to default on the Debenture with Defendant Johnson.

164. Defendant Johnson further represented to Hart Ski Corporation's investors that he would be taking over Hart Ski Corporation in June 2009, when his Debenture Agreement matured.

165. Thereafter, on numerous occasions Defendant Johnson informed Hart Ski Corporation's customers that the Hart Ski Corporation Officers' alleged gross mismanagement, Hart Ski Corporation was going to default on the Debenture with Defendant Johnson.

166. Defendant Johnson further represented to Hart Ski Corporation's customers that he would be taking over Hart Ski Corporation in June 2009, when his Debenture Agreement matured.

167. Defendant Johnson and Mr. Reinel further inquired of suppliers, including a ski manufacturer in Poland, regarding new production runs in June 2009; furthermore, Mr. Reinel began making arrangements with clothing and ski boot manufacturers in order to expand Hart Ski Corporation's product line with Defendant Johnson, without Hart Ski Corporation's knowledge or approval.

168. At this time, Defendant Johnson and Mr. Reinel had been marketing this new product line in preparation for his alleged anticipated take-over of Hart Ski Corporation in June 2009.

169. Defendant Johnson and Mr. Reinel contacted some of Hart Ski Corporation's current and former representatives and informed them to be prepared for his take-over of Hart Ski Corporation in June.

**Hart Ski Corporation terminates Defendant's Employment**

170.    On or about May 11, 2009, Hart Ski Corporation terminated Defendant's employment for breaches of Defendant's Employment Agreement and fiduciary duties to Hart Ski Corporation as an Officer and employee.

<u>COUNT I</u>
**BREACH OF CONTRACT**

**(DEFENDANT JOHNSON)**

171.    Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

172.    Plaintiffs and Defendant Johnson entered the Employment Agreement, whereby Defendant Johnson agreed to the following:

> A. To devote such business, time and services to the affairs of Hart Ski Corporation as may be reasonably required by the Chief Executive Officer and the Board of Directors of Hart Ski Corporation to carry out his duties;
>
> B. Not engage in any other ski related business or as a consultant to any other business entity in the ski industry or to other individuals associated with the ski industry during the term of this Agreement, without the written consent of the Company's CEO; and
>
> C. Perform such duties as Chief Operating Officer and Director of Sales as may be reasonably assigned to him from time to time by the Chief Executive Officer and Board of Directors of Hart Ski Corporation.

173.    In addition, under the Employment Agreement and in return for this compensation, Defendant Johnson agreed that during the period of his employment by Hart Ski Corporation and for a further period of one (1) year after termination, he would

not directly or indirectly as an owner, stockholder, partner, employee, or otherwise engage in a similar business as Hart Ski Corporation.

174. The parties' contract is a valid, enforceable contract under Minnesota law.

175. Plaintiffs have fulfilled all of their contractual obligations necessary to demand performance from Defendant Johnson.

176. Defendant Johnson failed and continues to fail to comply with his obligations under the contract including, without limitation:

    A. Failing to devote such business, time and services to the affairs of Hart Ski Corporation as may be reasonably required by the Chief Executive Officer and the Board of Directors of Hart Ski Corporation to carry out his duties;

    B. Engaging in other ski related business or as a consultant to any other business entity in the ski industry or to other individuals associated with the ski industry during the term of this Agreement, without the written consent of the Company's CEO; and

    C. Failing to perform such duties as Chief Operating Officer and Director of Sales as may be reasonably assigned to him from time to time by the Chief Executive Officer and Board of Directors of Hart Ski Corporation.

177. In addition, Defendant Johnson failed and continues to fail with his obligation under the contract, that during the period of his employment by Hart Ski Corporation and for a further period of one (1) year after termination, he would not directly or indirectly as an owner, stockholder, partner, employee, or otherwise engage in a similar business as Hart Ski Corporation.

178.   Defendant Johnson has breached the Agreement by, in part, entering into agreements with Hart Ski Corporation representatives including, but not limited to, Horst Reinel, to compete with Hart Ski Corporation.

179.   As a direct and proximate result of Defendants Johnson' breaches of contract, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

**COUNT II**
**USURPATION OF CORPORATE OPPORTUNITY**

**(DEFENDANT JOHNSON)**

180.   Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

181.   Defendant Johnson, as an Officer of Hart Ski Corporation and Shareholder of QAM, has an ongoing fiduciary duty to share with and direct all related business opportunities of Hart Ski Corporation and QAM to Hart Ski Corporation and QAM.

182.   Plaintiffs have a legitimate interest or expectancy that the income and/or revenue generated by Defendant Johnson and operated through Defendant Johnson and Johnson-Muckerman Enterprises would belong to Plaintiffs.

183.   Defendant Johnson, as a shareholder of QAM, the majority shareholder of Hart Ski Corporation, has wrongfully diverted business opportunities to Defendants for Defendants' actual and personal benefit.

184.    Defendant Johnson, while an Officer of Hart Ski Corporation, wrongfully diverted his time, efforts and energy to Defendants for Defendants' actual and personal benefit.

185.    Hart Ski Corporation and QAM had a legitimate interest in the business diverted to Defendants by Defendant Johnson and these opportunities belong Hart Ski Corporation and QAM, and not Defendants.

186.    Hart Ski Corporation and QAM had a legitimate interest in the time, efforts, energy and business diverted to Defendants by Defendant Johnson and these opportunities belong to Hart Ski Corporation and QAM, and not Defendants.

187.    As a direct and proximate result of Defendant Johnson's usurpation of corporate opportunity, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

**COUNT III**
**BREACH OF DUTY OF LOYALTY**

**(DEFENDANT JOHNSON)**

188.    Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

189.    While employed by Hart Ski Corporation, Defendant Johnson had a duty of loyalty to Hart Ski Corporation including, without limitation, a duty not to engage in self-dealing behavior, solicit Hart Ski Corporation investors, representatives, dealers and

suppliers for himself and a duty to not otherwise compete with Hart Ski Corporation while employed by Hart Ski Corporation.

190. Furthermore, Defendant Johnson had a duty not to use the assets of Hart Ski Corporation to compete with Hart Ski Corporation.

191. As set forth above, Defendant Johnson engaged in self-dealing behavior, solicited Hart Ski Corporation's investors, representatives, dealers and suppliers for himself, and otherwise competed with Hart Ski Corporation while employed by Hart Ski Corporation.

192. Defendant Johnson's actions as set forth above constitute a violation of his duty of loyalty to Hart Ski Corporation.

193. As a direct and proximate result of Defendant Johnson's breach of his duty of loyalty to Plaintiffs, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

### (DEFENDANT JOHNSON)

194. Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

195. Under Minnesota statutes and the common law, shareholders of a closely held corporation owe a fiduciary duty to one another.

196. Shareholders of a corporation owe each other the duty to deal with one another openly, honestly and fairly with one another and must act with the highest standard of integrity and good faith when dealing with one another.

197. Defendant Johnson has breached his fiduciary duty to QAM, as a shareholder, through his pattern of self-dealing behavior including, but not limited to, selling Hart Ski Corporation's products on his own or through other entities or other distribution channels without providing QAM or Hart Ski Corporation with the opportunity to profit therefrom.

198. Upon information and belief, Defendant Johnson has acted as set forth above for the purpose of negatively impacting the operations and future of QAM and Hart Ski Corporation, and the shareholders' ability to obtain a profit therefrom.

199. Defendant Johnson's actions as set forth above are a breach of his fiduciary duties to the other shareholders.

200. As a direct and proximate result of Defendant Johnson's breach of his fiduciary duty, Plaintiffs have and continue to suffer damages in excess of $75,000.00, plus costs, disbursements and attorneys' fees, the exact amount to be determined at trial.

## COUNT V
## BREACH OF FIDUCIARY DUTY

### (DEFENDANT JOHNSON)

201. Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

202.    Pursuant to Minn. Stat. § 302A.361, an Officer of a corporation owes a fiduciary duty to the Company to exercise the duties of the office of manager in good faith, in a manner the manager reasonably believes to be in the best interests of the company, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

203.    Defendant Johnson has breached his fiduciary duty to Hart Ski Corporation as an Officer, through his bad-faith mismanagement of the Company during her tenure COO and Director of Sales.

204.    Defendant Johnson has breached his fiduciary duty to Hart Ski Corporation as an Officer through his pattern of self-dealing behavior including, but not limited to, selling Hart Ski Corporation's products on his own or through other entities or other distribution channels without providing Hart Ski Corporation with the opportunity to profit therefrom.

205.    As a direct and proximate result of Defendant Johnson's violation of Minn. Stat. § 302A.361, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable costs, disbursements and attorneys' fees, the exact amount to be determined at trial.

## COUNT VI
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

### (DEFENDANTS)

206.    Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

207.   Plaintiffs had a reasonable expectation of an economic advantage or benefit resulting from their business relationships with their investors, representatives, dealers, and suppliers.

208.   Defendants had knowledge of Plaintiffs' reasonable expectation of an economic advantage or benefit resulting from Plaintiffs' business relationships with their investors, representatives, dealers, and suppliers.

209.   Defendants wrongfully, intentionally and without justification interfered with Plaintiffs' reasonable expectation of an economic advantage or benefit resulting from Plaintiffs' business relationships with its investors, representatives, dealers, and suppliers.

210.   But for Defendants' wrongful, intentional and unexcused actions, Plaintiffs would have realized the economic advantages or benefits from Plaintiffs' business relationships with its investors, representatives, dealers, and suppliers.

211.   As a direct and proximate result of Defendants' tortious interference, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

**COUNT VII**
**FRAUD / INTENTIONAL MISREPRESENTATION**

**(DEFENDANT JOHNSON)**

212.   Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

213.    Defendants made the following representations to Plaintiffs, with the intent

that Plaintiffs rely thereon:

       A. Defendant Johnson represented and continued to represent to Hart Ski Corporation that he would provide a complete accounting of any and all inventory owned by Hart Ski Corporation and held on Defendant's premises.

       B. Defendant Johnson represented and continued to represent to Hart Ski Corporation that he would provide Hart Ski Corporation with the use of Defendant's merchant account and credit card machine, and would immediately remit any proceeds received to Hart Ski Corporation.

       C. Defendant Johnson further represented and continued to represent to Hart Ski Corporation that he would provide a complete accounting of any proceeds received and all inventory sold to representatives, dealers or end-consumers.

       D. Defendant Johnson further omitted that inventory Defendant sold to representatives, dealers, and end-consumers, was not on behalf of Hart Ski Corporation, but on behalf of Defendant Johnson-Muckerman Enterprises; and

       E. Defendant Johnson represented and continued to represent that he had the ability to and would loan up to $300,000.00 to Hart Ski Corporation as its "banker," with cash he possessed through his own independent wealth.

214.    At the time of Defendant Johnson's representations, the representations

were false and were intended to defraud Plaintiffs.

215.    Plaintiffs were justifiably induced to and did rely on Defendant Johnson's

representations by entering into the Debenture Agreement and Employment Agreement

with Defendant Johnson and refraining from terminating Defendant Johnson's employment relationship with Hart Ski Corporation for more than six months.

216.    As a direct and proximate result of Defendant Johnsons' fraudulent representations, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

### COUNT VIII
### NEGLIGENT MISREPRESENTATION

### (DEFENDANT JOHNSON)

217.    Plaintiff restates and realleges the foregoing paragraphs as though fully stated herein.

218.    Defendant Johnson, in the course of his business, profession or employment, supplied information to Plaintiffs including, but not limited to, sales and inventory accounting, for guidance in a business transaction as set forth above.

219.    Defendant Johnson also represented to Plaintiffs that he would be willing to loan up to $300,000.00 to Hart Ski Corporation as its "banker," for the purchase of ski inventory, by way of cash acquired through his significant personal wealth.

220.    The information provided by Defendant was false.

221.    Defendant failed to exercise reasonable care or competence in obtaining or communicating the false information as set forth above.

222.    Plaintiffs reasonably relied upon the false information provided by Defendant Johnson in entering into the Debenture Agreement and Employment

Agreement with Defendant Johnson and refraining from terminating Defendant Johnson's employment relationship with Hart Ski Corporation for more than six months.

223.   As a direct and proximate result of Defendant Johnson's negligent misrepresentations, Plaintiffs have and continue to be damaged in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

**COUNT IX**
**DEFAMATION**

**(DEFENDANT JOHNSON)**

224.   Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

225.   Defendant Johnson made certain statements as set forth above, claiming that Hart Ski Corporation and its Officers and Board of Directors were inept, substantially mismanaged Hart Ski Corporation and that Defendant Johnson would be taking over Hart Ski Corporation in June 2009, when his Debenture Agreement went into default.

226.   Those statements are false; neither Hart Ski Corporation, nor its Officers and Board of Directors are inept, substantially mismanaged the Company or in jeopardy of causing Defendant Johnson's Debenture Agreement to go into default.

227.   Defendant Johnson communicated those statements to third parties, including investors, representatives, dealers, and suppliers for Hart Ski Corporation.

228. Defendant Johnson's statements affected Hart Ski Corporation in its business.

229. Defendant Johnson's statements tended to harm Hart Ski Corporation and to lower Hart Ski Corporation in the estimation of the community.

230. As a direct and proximate result of Defendant Johnson's defamation, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable costs, disbursements and attorneys' fees, the exact amount to be determined at trial.

## COUNT X
## BUY-OUT ON MOTION PURSUANT TO MINN. STAT. § 302A.751

### (DEFENDANT JOHNSON)

231. Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

232. Defendant Johnson, as a shareholder of QAM, has acted fraudulently, illegally, and in a manner unfairly prejudicial toward Plaintiffs, in his capacity as a shareholder of QAM, as set forth above.

233. QAM's assets are being misapplied or wasted by Defendant Johnson as set forth above.

234. Equitable relief, in the form of a Court ordered buy-out, would be adequate to permanently relieve the circumstances set forth above.

235. As a direct and proximate result of Defendant Johnson's fraudulent, illegal and unfairly prejudicial activity as a shareholder of the QAM, and the wasting and/or

misapplication of QAM and Hart Ski Corporation's assets, QAM is entitled to a buy-out on motion pursuant to Minn. Stat. § 302A.751, subd. 2, plus whatever other relief the Court deems just and equitable under the circumstances.

### COUNT XI
### ATTORNEYS' FEES PURSUANT TO MINN. STAT. §§ 302A.473 & 302A.751

**(DEFENDANTS)**

236.    Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

237.    Minnesota law provides that attorneys' fees are recoverable if provided for under contract or statute.

238.    Minn. Stat. §§ 302A.473 and 302A.751 provide Plaintiffs are entitled to the recovery of their reasonable attorneys' fees incurred in this case.

239.    Defendants have acted in a manner entitling Plaintiffs to attorneys' fees under Minn. Stat. §§ 302A.473 and 302A.751, the exact amount to be proven at trial.

### COUNT XII
### CONSPIRACY

**(DEFENDANTS)**

240.    Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

241.    Defendants in combination with a plan or purpose of action conspired against Plaintiffs to harm Plaintiffs through the willful and malicious destruction of Plaintiff's business through interference with Plaintiff's investors, representatives, dealers and suppliers.

242.   As a direct and proximate result of Defendants' conspiracy, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

## COUNT XIII
## ACCOUNTING

### (DEFENDANTS)

243.   Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

244.   Defendant Johnson undertook certain responsibilities with regard to maintaining inventory and accounting for sales of inventory to representative, dealers and end-customers.

245.   Defendant Johnson failed to properly perform its responsibilities including, without limitation, failing to maintain inventory records or adequate records of sales of inventory to representative, dealers and end-customers.

246.   Upon information and belief, Defendants have and continue to be in possession of inventory and proceeds of sales of inventory to representatives, dealers, and end-customers.

247.   Plaintiffs have been damaged by the aforementioned wrongful acts of Defendants; however, Plaintiffs are unable to accurately assess the nature and extent of such damage without an accounting of all activities and property in possession of Defendants.

248. Plaintiffs are entitled to an Order requiring a detailed accounting of Defendants' activities relating to Plaintiffs' inventory and sales including, without limitation, inventory maintained on behalf of Hart Ski Corporation, and any and all sales of inventory made to representatives, dealers, and end-customers on behalf of Plaintiffs or Defendants.

**COUNT XIV**
**INJUNCTION**

**(DEFENDANTS)**

249. Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

250. Plaintiffs do not have an adequate remedy at law to remedy the interference with Plaintiffs' property rights as stated above.

251. Plaintiffs are suffering irreparable harm as a result of Defendants' continued unlawful actions including, but not limited to, Defendants' defamatory behavior and his pattern of self-dealing behavior including, but not limited to, selling Hart Ski Corporation's products on his own or through other entities or other distribution channels without providing Plaintiffs with the opportunity to profit therefrom.

252. Therefore, Plaintiffs seek temporary and permanent injunctive relief against Defendants enjoining him from engaging in further defamatory behavior or further selling Hart Ski Corporation products, or otherwise competing with Plaintiffs.

<u>COUNT XV</u>
**TRADEMARK INFRINGEMENT 15 U.S.C. § 1125(a)**

**(DEFENDANTS)**

253.    Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

254.    Hart Ski Corporation holds a trademark to the Hart brand and name.

255.    Hart Ski Corporation did not authorize Defendants to sell products bearing the trademarked Hart brand and name.

256.    Defendant Johnson, as an Officer, Director, and upon information and belief shareholder of Johnson-Muckerman Enterprises, sold products bearing the trademarked Hart brand and name.

257.    Defendant Johnson's sale of products bearing the trademarked Hart brand and name, as an Officer, Director and upon information and belief shareholder of Johnson-Muckerman Enterprises, is likely to cause confusion among prospective customers that Johnson-Muckerman Enterprises was part of Hart Ski Corporation authorized sales network.

258.    As a direct and proximate result of Defendants' trademark infringement, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

## COUNT XVI
## CONVERSION

### (DEFENDANTS)

259.   Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

260.   Hart Ski Corporation is the owner of inventory and accounts receivable as defined above, as well as other property.

261.   Defendants have willfully interfered and continue to interfere with Hart Ski Corporation's property including, without limitation, its inventory and accounts receivable, without justification or the consent of Hart Ski Corporation's.

262.   Defendants' willful interference with the property of Hart Ski Corporation including, without limitation, its inventory and accounts receivable, deprives Hart Ski Corporation of its dominion over the property, including its inventory and accounts receivable, and Defendants' interference is inconsistent with Hart Ski Corporation's exercise of dominion over the property.

263.   As a direct and proximate result of Defendants' conversion, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

## COUNT XVII
## CIVIL THEFT

### (DEFENDANTS)

264.   Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

265. Minn. Stat. § 604.14 provides, in part, that "a person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50.00 or up to one hundred percent (100%) of its value when stolen, whichever is greater."

266. Defendants have stolen personal property from Plaintiffs including, without limitation, inventory and proceeds from the sale of inventory.

267. Under Minn. Stat. § 604.14, Defendants are liable for the value of the property stolen plus punitive damages of either $50.00 or up to one hundred percent of its value on the date it was stolen.

268. As a direct and proximate result of Defendants' violation of Minn. Stat. § 604.14, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, together with costs and disbursements, including costs of investigation and reasonable attorneys' fees, the exact amount to be determined at trial.

## COUNT XVIII
## UNJUST ENRICHMENT

### (DEFENDANTS)

269. Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

270. Defendants have unlawfully received a benefit from Plaintiffs including, without limitation, the generation of income from Defendant's unlawful sale of Hart Ski Corporation's inventory for Defendant's benefit.

271. Defendants knowingly accepted these benefits.

272.    Defendants appreciated the benefits conferred upon them.

273.    Defendants have been unjustly enriched as a result of their unlawful conduct as set forth above.

274.    Plaintiffs have been damaged as a result of the actions of Defendants.

275.    Under the circumstances as set forth herein, it would be inequitable for Defendants to retain the benefits conferred upon it without paying for the value of said benefits.

## COUNT XIX
## UNFAIR COMPETITION

### (DEFENDANTS)

276.    Plaintiffs restate and reallege the foregoing paragraphs as though fully stated herein.

277.    Minnesota law provides that it is unlawful for Defendants to engage in unfair competition.

278.    The conduct of Defendants as set forth above including, without limitation, Defendants' breach of their duties of loyalty, tortious interference with prospective business advantages and fraud / misrepresentation, constitutes unfair competition under Minnesota law.

279.    As a direct and proximate result of Defendants' unfair competition, Plaintiffs have and continue to suffer damages in an amount in excess of $75,000.00, plus reasonable attorneys' fees, costs and disbursements, the exact amount to be determined at trial.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants Glen Johnson and Johnson-Muckerman Enterprises, Inc. as follows:

1.      Judgment in favor of Plaintiffs and against Defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand and no/100 Dollars ($75,000.00), plus reasonable costs and disbursements, the exact amount to be determined at trial;

2.      An entry of temporary and permanent injunctive relief in favor of Plaintiffs and against Defendants Glen Johnson and Johnson-Muckerman Enterprises, Inc., as the Court deems just and equitable under the circumstances of this case;

3.      For an award of Plaintiffs' attorneys' fees incurred in this case;

4.      For a judgment sounding in equity to properly and justly implement the orders and judgments of the Court; and

5.      For such other and further relief as the Court deems just and equitable under the facts and circumstances of this case.

**SKJOLD ▪ BARTHEL, P.A.**

Dated: June 1, 2009                    s/ Christopher P. Parrington
                                       Christopher P. Parrington (#034090X)
                                       Benjamin R. Skjold (#292217)
                                       222 South 9th Street, Suite 3220
                                       Minneapolis, MN  55402
                                       [P]: 612-746-2560
                                       [F]: 612-746-2561

                                       *Attorneys for Plaintiffs QAM Corporation and*
                                       *Hart Ski Corporation*

# SKJOLD ▪ BARTHEL
### BUSINESS ATTORNEYS

*E-Mail:*
*mmetfessel@skjold-barthel.com*

June 1, 2009



Court Administration
United States District Court, District of Minnesota
US Courthouse
300 South Fourth Street
Minneapolis, MN 554415

      Re:   Hart Ski Corporation, et al., v. Glen Johnson, et al.

Dear Sir or Madam:

Enclosed for filing in connection with the above-referenced matter, please find:

    1.     Summons and Complaint; and

    2.     Civil Cover Sheet;

We have also enclosed a check in the sum of $350.00 representing filing fees.

                       Very truly yours,
                       Skjold ▪ Barthel, P.A.

                       Mary Ann Metfessel
                       Legal Assistant

mam
Enclosures